IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| LOCKWOOD AUTO GROUP, INC. | : | Case No. 05-13558-TPA |
| *Debtor* | : | Chapter 7 |
| | | |
| RICHARD W. ROEDER, Trustee, | : | |
| *Plaintiff* | : | Adversary No. 06-1100-TPA |
| | : | |
| v. | : | Related to Document No. 69 |
| | : | |
| BARBARA A. LOCKWOOD, | : | |
| FIRST NATIONAL BANK of PA, | : | |
| *Defendants* | : | |

*Appearances:*  Richard W. Roeder, Esq., Chapter 7 Trustee, Plaintiff
John C. Melaragno, Esq., for Defendant Barbara Lockwood
Patrick Delaney, Esq., for Defendant First National Bank
John M. Steiner, Esq., for the Debtor

## MEMORANDUM OPINION AND ORDER

Trial on the **Amended Complaint** filed by the Trustee was held on December 15, 2010. The Parties were given an opportunity to file post-trial briefs to further argue their positions and they have done so. For the reasons set forth below, the Court finds that the Plaintiff has failed to meet his burden of proving that the transfers at issue were made with an actual intent to hinder, delay or defraud creditors. Therefore, judgment will be entered in favor of the Defendant and the case will be dismissed.[1]

---

[1]  The Court's jurisdiction under *28 U.S.C. §§157* and *1334* was not at issue. This is a core proceeding pursuant to *28 U.S.C. §§157(b)(2)(K)* and *(O)*.

## PROCEDURAL BACKGROUND

Richard W. Roeder ("Trustee") is the Chapter 7 Trustee of the Debtor, Lockwood Auto Group, Inc. ("LAG"), which formerly operated an automobile dealership in Girard, Pennsylvania.  The Trustee filed this adversary proceeding on May 9, 2006, against First National Bank of PA ("FNB") and Barbara Lockwood ("Lockwood"), the former principal of LAG.[2]   At issue are a series of prepetition transactions in which Lockwood borrowed money from FNB, used the funds to purchase Certificates of Deposit ("CDs") titled in the name of LAG, which CDs were pledged as collateral for the loans to Lockwood.  The Trustee questions the propriety of these transactions.  His *Amended Complaint* sets forth three counts: Count I, a fraudulent transfer (actual fraud) claim under the Pennsylvania Uniform Fraudulent Transfer Act Law ("PUFTA"), *12 Pa. C.S.A. §5101, et. seq.*; Count II, a fraudulent transfer (actual fraud) claim under *11 U.S.C. §548(a)(1)(A)*; and Count III, a claim for equitable subordination pursuant to *11 U.S.C. §510.*

The relevant, underlying facts are largely not in dispute. The case has received considerable attention from the Court prior to trial in connection with a number of filings by the Parties, including several motions for summary judgment.  The undisputed facts were  previously set forth in some detail in an Opinion on prior cross-motions for summary judgment.  *See Memorandum Opinion and Order* dated May 31, 2007 ("May 31, 2007 Opinion"), Document No. 32, reported at *In re Lockwood Auto Group, Inc.*, 370 B.R. 652 (Bankr. W.D. Pa. 2007).  Further exposition of the basic facts is set forth in the *Memorandum Opinion and Order* dated May 14, 2010

---

[2]     The case as against  Lockwood was dismissed immediately after the trial because the Trustee presented no case against her.  *See Order* of December 16, 2010, Document No. 153.

("May 14, 2010 Opinion") denying a prior motion for summary judgment filed by FNB.[3] *See, In re Lockwood Auto Group, Inc.*, 428 B.R. 629 (Bankr. W.D. Pa. 2010). Familiarity with the basic facts is therefore assumed and factual details will not be restated here except as necessary.

The trial of this matter was shaped by the District Court which reversed the Bankruptcy Court Order following the May 31, 2007 Opinion and remanded the matter to the Bankruptcy Court for further proceedings.[4] In the May 31, 2007 Opinion, Judge Bentz found that LAG had received no value in exchange for its pledge of the CDs. He therefore determined that the transaction was a constructive fraudulent transfer under *11 U.S.C. §548(a)(1)(B)* and granted summary judgment in favor of the Trustee. On appeal, however, the District Court found that LAG had received reasonably equivalent value for the pledge and that a constructive fraudulent transfer could not be pursued. The District Court then reversed and entered summary judgment in favor of FNB as to that claim. The matter was then remanded to the Bankruptcy Court for further consideration of the claims for actual fraudulent transfer and equitable subordination, since the Bankruptcy Court had not previously addressed them.

The real issue at trial was thus one of motive. Specifically, did Lockwood/LAG [5]

---

[3]      The Court incorporates by reference the statements of fact as set forth in the *May 31, 2007 Opinion* and the *May 14, 2010 Opinion* and adopts them here as part of its findings of fact pursuant to *Fed.R.Bankr.P. 7052*, as further supplemented by any additional findings of fact made herein.

[4]      The *May 31, 2007 Opinion* was authored by the Honorable Warren W. Bentz. It was appealed to the District Court, which reversed and remanded in an unpublished March 20, 2008 Memorandum Opinion and Order by the Honorable Sean J. McLaughlin at W.D. Pa. Civ. Docket No. 1:07-cv-162. Judge Bentz initially handled the remanded case but he retired, effective September 22, 2009, and the case was reassigned to the Undersigned at that time.

[5]      Lockwood was at all times either the sole owner of LAG, or by far, the majority owner. Given the nature of the transactions at issue it is sometimes difficult to pinpoint whether a particular action was that of Lockwood, or LAG, or both, and for the most part, such distinctions are not critical to the Court's decision. In recognition of that, the designation "Lockwood/LAG" is sometimes used as shorthand, collective reference to the two in this Opinion.

cause the transfers to be made with the actual intent to hinder, delay, or defraud creditors? As to this question, the Court previously ruled that the Trustee had the burden of proof by clear and convincing evidence. A second question, which would only arise if and when the Trustee met his burden of proof as to the first question, was whether FNB nevertheless acted in good faith in connection with the transfers. If the second question became relevant, FNB would then have the burden of proof by a preponderance of the evidence.[6]

In his case in chief, the Trustee presented the testimony of fact witnesses Lockwood, David Slomski (as on cross-examination), John Stolar (as on cross-examination), and John Wegerszyn. The Trustee also presented the testimony of a banking industry expert witness, Lawrence Gardner. At the close of the Trustee's case, Counsel for FNB made an oral motion for directed verdict and dismissal of the case pursuant to *Fed.R.Bankr.P. 9013*, contending that the Trustee had failed to meet his burden of proving there was an actual intent to hinder delay or defraud. After hearing brief argument on the matter, the Court advised the Parties that, although it tended to agree that the Trustee had not met his burden, the motion would be taken under advisement and not ruled upon at that time so that FNB could put on evidence going to the good faith question so "everything is covered" in the event of an appeal. FNB then proceeded to present the testimony of two  witnesses, Matt Minnaugh an expert in accounting, and Thomas Doolin an expert in banking.

### FACT WITNESSES TESTIMONY

The Trustee presented little evidence going to the fundamental question of whether

---

[6]      *See Final Pretrial Scheduling Order of October 19, 2010*, Document No. 150  (setting forth the issues remaining for trial and the burden of proof).

the transactions at issue were done with the actual intent to hinder, delay or defraud creditors, and the evidence that was presented on this point was insufficient to meet the Trustee's burden of proof. Several things became apparent to the Court from the testimony of Lockwood, an 83 year old woman who formed LAG to own and operate the longtime family car dealership after the successive deaths of her husband, at an unspecified earlier time, and then, her son, Jim, in 2001 or 2002. First, although she was the owner and president of LAG, she was not involved in the day-to-day operations of the dealership. Those duties were handled by her other son, Michael Lockwood ("Michael"), who was the general manager of the dealership.

Second, Michael was the person who had most of the dealings with FNB concerning the transactions which are at issue in this case. Lockwood's involvement was essentially limited to appearing at David Slomski's office at FNB and signing the various papers involved in the transactions, either on Lockwood's own behalf or on behalf of LAG in Lockwood's capacity as President. The form of the transactions was decided by Michael, the person who had the necessary communication with Slomski that preceded the preparation of the documents signed by Lockwood.

Third, Lockwood had limited independent recollection of the events surrounding the transactions. She stated that she did not have a recollection of the events in 2002 involving the initial transaction but was basing her testimony on what she has been recently told. She also displayed uncertainty on a number of potentially key points. When asked whether LAG's floor plan financier, Daimler Chrysler Financial ("DCF"), was aware of the initial transaction she responded: "Yes. I believe so. I don't know." *Partial Transcript of Trial* at page 6, Doc. No. 157 (hereinafter "*Tr. Tran. at __*"). She went on to state that she had not told DCF about it, and asked whether

anyone else in LAG management had done so she relied "Probably my son. I don't know." *Tr.*

*Tran. at 7.* Lockwood also testified that to the best of her knowledge the CDs were reflected within

the monthly financial statements that LAG routinely submitted to DCF.

Although the Court believes that Lockwood was attempting to be truthful in her

testimony, her lack of involvement in the day-to-day operations of LAG and the discussions that

preceded the transactions, her candid acknowledgment of a lack of independent recollection, and

her uncertainty on a number of matters, all combine somewhat to limit the weight which can be

given to her testimony on disputed points.

The only other testifying witness who had personal involvement in the transactions

at issue was Slomski. Slomski has been in the banking industry since 1973 and currently works for

Marquette Savings Bank. He worked for FNB as a loan officer from 1999 to 2009, so he was

employed there during the entire, relevant time period involved with the transactions at issue (i.e.,

from 2002 through 2005). He had lending authority of $500,000 during the relevant period. The

Court found Slomski to be a credible witness, with a good general recollection of the  relevant

events.

Slomski handled all of the transactions at issue on behalf of FNB, functioning as loan

originator, analyzer, and approver. He stated that this sort of multiple role was not unusual in his

experience in the banking industry for  loans of the size in question. Slomski testified that he was

the only person from FNB with involvement and decision-making authority in the transactions, with

the exception that on one occasion he spoke to a senior lender, John Stolar, regarding one of the

transactions in the series when an issue arose about his (Slomski's) lending authority.[7]  He confirmed Lockwood's testimony that it was Michael who initiated the contact with FNB which led to the consummation of the transactions, and it was Michael with whom he had most of his dealings. Nevertheless, it was Lockwood and LAG who were actually FNB's "customers" in the transactions, Lockwood as a borrower and LAG as a depositor.

The particular form of the transaction at issue was unique to Slomski's experience and was proposed by Michael.  Slomski testified that Michael told him that DCF had approved the form of the transaction.  Slomski himself never had any direct contact with DCF.  For purposes of loan approval under the FNB credit policy manual, a financing statement from the borrower, Lockwood, was not mandatory because FNB would be 100% secured with cash collateral in its possession.  Slomski nonetheless did obtain what proved to be a strong, personal financial statement from Lockwood in connection with the initial transaction.  Lockwood's credit report was also requested and it reflected an excellent credit score of 792.  As part of the pre-loan due diligence process Slomski also obtained the most recent available 2000 tax return for the dealership (which predated the death of Lockwood's son Jim and related to his period of owning the dealership), and a current dealer financial statement which Slomski explained was a form often used by car dealers to report to their franchise holder. *Tr. Tran. at 50.*  The dealer financial statement showed a company net worth of approximately $333,000 as of the end of 2001.

---

[7]    Slomski stated that he was not sure which in the series of transactions was the one in which he spoke to Stolar, although he was certain it was not with respect to the first transaction.  *Tr. Tran. at 28.*

Slomski reviewed the various pieces of information that he received prior to the initial transaction and put his thoughts down in a "core analysis memorandum" that became part of the FNB loan file.  He noted in this memorandum that Lockwood's income was expected to increase substantially with compensation from LAG and that debt service concerns were minimized because the loan would be fully secured by a CD.  He also noted that Lockwood had already injected $100,000 into the company and would be injecting the remainder with the proceeds of the proposed loan, concluding by stating that "Chrysler is agreeable to that portion of the investment being invested in the certificate of deposit and the CD in turn pledged as collateral for Mrs. Lockwood's loans." *Tr. Tran. at 55.*

After the initial transaction was concluded with all proper payments having been timely made, FNB's "comfort level" going into the renewals and subsequent transactions increased and Slomski does not recall doing any further investigation into the financial condition of Lockwood or LAG, although the loan file did show that at some point a September 2002 dealer financial statement was received by FNB.  Slomski testified that when the cumulative transaction amount increased from $100,000 to $200,000 it did not occur to him that it might have been triggered by something required by DCF.  He said he assumed DCF would exercise due diligence and monitor the situation to make sure its requirements were being satisfied.  *Tr. Tran. at 35.*

Slomski was also asked about another matter not dealing directly with the documents and process employed by FNB in deciding whether to enter into the transactions.  The questions related to a consolidated financial statement for LAG for the period ending December 2003.  *See* Exhibit 18.  Slomski testified without objection that he saw this statement during the course of this

8

litigation, and that based on his accounting background, he agreed with the way this statement accounted for the transactions involving FNB, Lockwood, and LAG.  He pointed to a footnote in the statement that provided:

> " Restricted cash includes two certificates of deposit totaling $205,599 that are pledged as collateral against obligations of the majority shareholder. These amounts will remain restricted until the objections have been satisfied."[8]

Even though there was no evidence presented that DCF was ever provided with this financing statement prior to the present litigation,  under the agreement that DCF had with LAG, it could have requested a copy of the statement at any time.  The Court thus views the inclusion of this information in the footnote as highly persuasive on the question of whether there was an actual intent to hinder, delay or defraud creditors.

Slomski also provided some testimony about his past experience with "floor plan lenders" of automobile dealerships, such as DCF was in this case with respect to LAG.  He stated that such lending is typically very "hands on" and detailed.  When asked whether he assumed that DCF would be adequately protecting its interests in its dealings with LAG and Lockwood, he responded:

> I would assume, being told that they had agreed to this, that whatever methodology they thought necessary would be applied to validate the injection or investment by Mrs. Lockwood.  And had we been asked, we, of course, would have very clearly identified that those certificates of deposit were pledged as collateral on Mrs. Lockwood's personal obligation.

---

[8]    At the time this consolidated financial statement was prepared, LAG had only one CD through FNB. Therefore, the Court assumes the reference to another CD in the footnote was to one from National City Bank, also mentioned in the testimony at trial.

*Tr. Tran. at 61-62.*  There was no evidence that FNB ever misled DCF as to the nature of the transactions, and no evidence it was aware that Lockwood was misleading DCF.  The Court sees no reason to disbelieve Slomski's testimony that FNB would have truthfully apprised DCF about the nature of the transactions if it had ever been asked.

Slomski's former supervisor at FNB, John Stolar, was also called by the Trustee. Stolar has been in charge of special lending at FNB since 1992 and functions as the credit officer for several of the counties served by the bank.  He said he did not have supervisory authority over any of the transactions at issue.  However, he did testify that he believes Slomski correctly followed FNB policy in all respects and was correct to assume that DCF, as a floor plan financier, would act to protect its own interests.  Stolar acknowledged that the form of the transactions was unusual, but said it was not unique because he was aware of one or two other similar transactions over the course of his banking experience.  The Trustee did not take issue with this testimony at trial.  The Court also views the testimony of Stolar as credible.

The Trustee next called John Wegerszyn as a witness, who had little to offer on the question of actual intent.  Wegerszyn is currently the manager of wholesale risk administration for DCF for the Mid-Atlantic Region (which included LAG), and before that he was the dealer credit manager for part of the Region.  However, prior to about April 1, 2004, he was working for DCF as a retail credit manager in an office in Dallas, Texas and thus has no personal knowledge of the events relevant to this case that occurred prior to that date.

10

Wegerszyn testified that he had no knowledge that the CDs involved in the 2004 and 2005 transactions were pledged to pay Lockwood's personal loan, and had he known such, he does not believe they would be able to be used as working capital. *Tr. Tran at 76, 79-80.* Wegerszyn also testified, however, to a belief that no one from DCF was aware of the pledge of the CDs at the time of the 2002 and 2003 transactions. Since that part of his testimony was admittedly not based on his personal knowledge, but apparently only on hearsay information he received from unnamed persons, the Court does not assign it any probative value.[9] *Tr. Tran. at 103. See, Johnson v. Dist. of* Columbia, 1995 W.L. 115882 *13 (D. D.C. 1995) (court accorded hearsay testimony little weight); *see also, Fed.R.Evid. 602* (witness may not testify as to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter).

On cross-examination, Wegerszyn confirmed that DCF had the contractual right to demand financial records from LAG and Lockwood any time it wanted. He also testified that dealers were required to submit monthly financial statements which were reviewed by credit analysts in the DCF Regional office. These monthly statements are to be done on a DCF-supplied form that does not include space for the dealer to put financial notes or other information. The forms that LAG submitted did not separately itemize the existence of the CDs. Wegerszyn testified that he thought they were included within a category designated as "Account 104" although he could not recall who had told him that, and when pressed, admitted that he could not verify if in fact the CDs

---

[9]    Wegerszyn's predecessor at DCF who would have been involved in dealing with LAG when the 2002 and 2003 transactions occurred was identified as a Thomas Racioppe. *Tr. Tran. at 72, 75.* Another individual named Hillis Trae Smith, a Chrysler field sales representative for the area which included LAG, was also identified as someone who may have had personal knowledge about the circumstances surrounding the transactions. *Tr. Tran. at 85-6.* Neither Racioppe or Smith was called as a witness by the Trustee, nor was there any attempt to explain their absence.

were included in the submitted form.  He also acknowledged that DCF had never done an audit of

LAG to determine if LAG was reporting the CDs.  In light of these admissions, the Court can assign

no probative weight to his testimony regarding these matters.

DCF also possessed the ability to do a "bank cutoff" with its dealers, including LAG.

A bank cutoff is an accounting examination designed to determine the value of a dealership's cash

position, equity, and vehicle inventory as of a particular "cutoff" date.   DCF did perform a bank

cutoff with respect to LAG on July 14, 2004, but Wegerszyn testified that no financial statements

from LAG or Lockwood were asked for at that time.  He testified that it was not normal practice to

ask for Generally Accepted Accounting Principles ("GAAP") compliant financial statements when

a bank cutoff was done.  It thus appears that DCF never requested the financial statement identified

as Exhibit 18 that identified the CDs being pledged for Lockwood's debt.

### *EVIDENCE OF ACTUAL INTENT*

In deciding this matter, the Court must first determine whether the Trustee has met

his burden of proof by providing any direct evidence of an actual intent by Lockwood/LAG to

hinder, delay, or defraud creditors.  Typically, direct evidence of any actual intent to defraud is not

available. This case was no different.  Little, if any, such direct evidence was offered and therefore

the Court must find that the Trustee has not met his burden through direct evidence.  The Court must

next consider whether the Trustee has otherwise met his burden through use of circumstantial

evidence which, in these types of cases, is most often demonstrated by showing the existence of

"badges of fraud" giving rise to inferences of fraudulent intent tending to support the Trustee's

burden of proof.  For the reasons given below, the Court concludes that he comes up short here as well.  Finally, upon examining the good faith of FNB, the evidence clearly supports a finding that FNB acted in good faith and therefore is protected on that basis in any event.  As a result of FNB's good faith conduct in regards to the matters at issue, the Trustee's request for the imposition of an equitable subordination remedy must be denied since he has shown no basis for it.

### *Direct Evidence of Actual Intent*

As noted above, the Trustee had an initial burden to prove by clear and convincing evidence that assets of LAG, i.e, the CDs, were transferred by Lockwood/LAG with the actual intent to hinder, delay or defraud creditors.  The Court finds that the Trustee has failed – and decisively so – to provide sufficient direct evidence to meet that burden.

The whole thrust of the Trustee's case from the beginning has been that Lockwood engineered what was essentially a sham or purposeless transaction with FNB just so LAG could obtain CDs and thereby show more capital on its books while at the same time fraudulently misrepresenting to DCF that the CDs were not encumbered by a pledge.  However,  based on the record presented at trial, the Court cannot even conclude that the Trustee has proven that LAG made any misrepresentations concerning the CDs  to DCF, let alone representations rising to the level of a fraudulent intent.

The main focus of the Trustee's contention of a misrepresentation was the monthly financial statements that LAG submitted to DCF.  As an initial matter, the elemental question as to

whether the CDs are even reported in these statements is not answered as clearly as it could be.[10]

The statements on their face do not make any reference to the CDs, so the Court cannot conclude that they do based solely on its own review of the documents.[11]   Furthermore, Wegerszyn, the only DCF witness presented by the Trustee, could not confirm that the CDs were actually included within the monthly statements.   He testified that it was his "understanding" that the CDs were included in the monthly statements under "Account 104," the heading for "Cash on Deposit."   However, he said that this understanding was based not on personal knowledge, but only on what someone had told him – a person he could not even name.   *Tr. Tran* at 100-101.   Wegerszyn also acknowledged that DCF had never performed an audit to determine whether the CDs were being actually reported on the monthly statements.   Wegerszyn also testified that in his experience "cash on deposit"  can  consist of such other things as petty cash,  payroll accounts, or  operating accounts.   *Id.*  at 102.

The only other testimony which was provided on the question of whether the CDs were included in the monthly statements was by Lockwood under questioning by the Trustee:

---

[10]     This issue of fact was in play at trial. The Trustee made a factual allegation in the *Amended Complaint* that LAG reported the CDs as cash on its "balance sheet".  *See Amended Complaint* at ¶51.  Presumably, this is a reference to the monthly financial statements that were submitted to DCF.  In its *Answer* FNB stated it was without sufficient information to admit or deny the allegations in this paragraph, therefore they were denied. *Answer* at ¶51.  This was a permissible response by FNB and had the effect of a denial.  *See Fed.R.Bankr.P. 7008*, incorporating *Fed.R.Civ.P. 8(b)(5)*.  Since the allegation was denied this factual issue was left to be determined at trial unless otherwise resolved or stipulated to by the Parties prior thereto.  The Parties did stipulate to certain facts prior to the trial but they did not stipulate that the CDs had been reported as cash, or otherwise, on the monthly financial statements.  *See  Combined Pretrial Narrative* at 15-19.

[11]     Only five of the monthly statements were introduced as Exhibits at trial.  *See* Exhibits 22-26, monthly statements dated April 1, 2002, January 1, 2004, September 1, 2004, February 1, 2005, and June 1, 2005.  There was no point made that these were in any way special or different so the Court assumes they are representative of the monthly statements that were submitted throughout the relevant time period.

14

> Q.      And, to the best of your knowledge, did those financial statements
>         show the certificates of deposit that you had invested in at First
>         National Bank?
> A.      Yes.

*Id.* at 10.  This was hardly ideal testimony on the point since the witness was not asked, and she did

not provide any further information, as to where on the financial statements the CDS were reported,

or, what was the basis of her knowledge in this regard.

        As indicated above, for a variety of reasons the Court is inclined to give the testimony

of Lockwood less weight, therefore, it would have been helpful if this area could have been explored

with her in more depth to establish if she really did possess an actual recollection as to the reporting

of the CDs.  Nevertheless, primarily because FNB did not contest the point at trial, the Court finds

that, through Lockwood's testimony, the Trustee has met his burden to show that the CDs were

included on the monthly financial statements.

        Finding that the CDs were included in the monthly statements does not, however,

equate to a finding that Lockwood/LAG were thereby engaged in a fraudulent misrepresentation

respecting the CDs.  The testimony showed that LAG electronically submitted the monthly financial

statements to DCF on a form as required by DCF.  That form was not GAAP (Generally Accepted

Accounting Procedures) compliant because it contained no place for a dealership to include financial

notes to indicate that assets shown on the form were actually encumbered.  There was also no

evidence that the dealership was required to state anywhere else on the form whether identified

assets were encumbered.  As best as the Court can determine from the evidence presented, the

monthly financial statements submitted by LAG were correctly filled-in by LAG.[12]  The Trustee's

only objection regarding this process was that LAG failed to go further and "volunteer" information

about the encumbrance that was not asked for in DCF's form.

The Trustee's position begs the question of whether LAG was under a duty to

volunteer such information.  Although perhaps not directly controlling here, it is worthwhile to note

Pennsylvania law on the topic of fraudulent concealment, something that was appropriately

summarized in an opinion by Judge David Cercone of the District Court for the Western District of

PA:

> ... "[i]t is axiomatic, of course, that silence cannot amount to fraud in the
> absence of a duty to speak." ... Pennsylvania's fraudulent concealment law
> is grounded in Section 551 of the *Restatement (Second) of Torts*, which
> defines the limited circumstances under which the duty to speak arises
> between parties to a particular transaction...
>
> Pennsylvania courts determine whether there is a duty to speak based
> almost exclusively on the nature of the transaction between the parties and
> the scope of one party's reliance on the representations of the other .... The
> duty has been extended to situations involving latent defects in the sales of
> real estate,
>
> such as a termite infestation where the buyer is at the whim of the seller to
> disclose the matter because it is not discoverable by other reasonable means
> ....  Beyond this arena the duty does not ordinarily arise in a transaction
> unless there is a confidential or fiduciary relationship between the parties
> ....  Such a relationship does not arise in a typical transactional setting
> unless "one party surrenders substantial control over some portion of its
> affairs to the other." ... Similarly, the duty does not arise where the parties
> have or can be assumed to have equal knowledge to the information
> available.

*Gaines v. Krawczyk*, 354 F. Supp. 2d 573, 585-86 (W.D. Pa. 2004).

---

[12]    The Court recognizes that there was a dispute between the expert witnesses as to whether it was
proper to categorize the CDs as current assets of LAG from an accounting standpoint but views that as a different
question than whether the monthly financial statements were correctly completed.

The Trustee has made no contention that Lockwood/LAG were in a confidential or fiduciary relationship with DCF. That is understandable because lender-borrower relationships do not ordinarily create fiduciary duties. *See, In re Cara Corp.*, 148 B.R. 760, 773 (Bankr. E.D. Pa. 1992) (also noting that there is no duty to disclose material information as between debtor and creditor). More specific to automobile dealerships, *see also, In re Coley*, 433 B.R. 476, 496 (Bankr. E.D. Pa. 2010) (noting that most courts have been reluctant to characterize a debtor as a fiduciary simply by virtue of the debtor's control of a business that has entered into a "floor plan" arrangement with a lender). The Court thus finds that the debtor-creditor relationship between the parties did not create a legal duty for Lockwood/LAG to voluntarily disclose information about the CDs beyond that which DCF asked for, consequently the failure to do so in and of itself cannot be viewed as a misrepresentation or a fraudulent concealment.

The Trustee points to the February 7, 2003 Recapitalization and Loss Replacement Agreement, Exhibit 32, and the July 22, 2003 Capital Loan Addendum to Master Loan and Security Agreement, Exhibit 33, as sources of a contractual duty imposed on Lockwood/LAG to inform DCF concerning the CDs. The Trustee asserts that Lockwood/LAG were in violation of those agreements because they entered into the transactions with FNB and then failed to inform DCF about the pledge of the CDs or require FNB's interest to be subordinated to DCF. As to that argument, it should first be noted that the inception of the series of transactions between Lockwood/LAG and FNB predated both of those agreements. This suggests to the Court that Lockwood/LAG may have reasonably (even if mistakenly) concluded that their relationship with FNB was an existing one that did not need to be disclosed pursuant to the agreements.

Furthermore, even if the Court assumes Lockwood/LAG were in violation of those two agreements respecting the CDs, that of itself does not assist the Trustee in meeting his burden of proving an actual intent to hinder, delay or defraud. The mere nonperformance of an agreement is not in itself evidence of fraud. *See Permenter v. Crown Cork & Seal Co.,* 38 F. Supp. 2d 372, 382 (E.D. Pa. 1999); *Oxford Indus., Inc. v. Luminco, Inc.,* 1991 WL 87928 (E.D. Pa. 1991) ("[a]n unperformed promise does not give rise to a presumption that the promisor intended not to perform when the promise was made, and a fraudulent intention will not be inferred merely from its nonperformance.")

In short, since the Trustee made no showing that Lockwood/LAG had no intention of complying with the agreements in question as of the time they were signed, a breach of the agreements, of itself, does not constitute evidence of an actual intent to hinder, delay or defraud. *See, e.g.*, *Nat'l. Data Payment Sys., Inc. v. Meridian Bank*, 212 F.3d 849 (3d Cir. 2000) (statement as to future plans or intentions is not fraudulent under Pennsylvania law unless it knowingly misstates the speakers state of mind when made); *Precision Printing Co. v. Unisource Worldwide, Inc.,* 993 F. Supp. 338 (W.D. Pa. 1998) ( mere promise to perform future acts, which promise is not kept, does not amount to fraud under Pennsylvania law unless promisor had no intention of keeping the promise at the time it was made). The Trustee has therefore failed to show that Lockwood/LAG made any fraudulent misrepresentations to DCF concerning the CDs in the monthly financial statements.

The only other possible source of misrepresentation by Lockwood/LAG concerning the CDs that has been brought to the Court's attention by the Trustee concerns Exhibit 30, the

internal DCF documentation of a "bank cutoff" procedure that it performed on LAG in December

2002.  Although the Trustee did mention this Exhibit  during the trial, he did so not during his case

in chief, but only in passing during his cross-examination of FNB's expert witness Thomas Doolin.

In his post-trial brief, however, the Trustee has elevated the status of this Exhibit almost to the level

of being the centerpiece of his argument.  The language of  particular interest in this document is

the following:

> The positive cash position of the dealership is contingent upon the
> accounting for two certificate of deposits totaling $231M.  Per the office
> manager both CDs are in the dealership's name and are not pledged.  For
> verification purposes I have requested a copy of both CDs from the office
> manager but have not received them as of this date.

*Exhibit 30* at 1.  At trial the Trustee did not pursue a line of questioning with Doolin or any other

witness concerning whether Exhibit 30 might be some evidence of a misrepresentation.    The

Trustee now, however, argues that the purported statement by the office manager as reflected in

Exhibit 30 "amounts to a fraudulent misrepresentation."  *Trustee's Post-trial Brief* at 3.

Exhibit 30 is a double-edged sword.  While on the one hand the quoted language at

first blush does appear to support the Trustee's argument that a misrepresentation possibly occurred,

on the other hand it also demonstrates in no uncertain terms that by December 2002, DCF was on

notice of the existence of the CDs and the lack of any confirming documentation in its possession

to show they had not been pledged and were therefore available to secure the debt that LAG owed

to DCF.  There was no evidence presented to show whether DCF ever received the documentation

from LAG which was purportedly requested, and if not, whether DCF ever made any further effort

to obtain information to confirm the status of the CDs.  It is thus not lost on the Court that the very

19

creditor who would stand to benefit from an award against FNB for its participation in an alleged fraudulent transfer was itself evidently guilty of supine neglect in failing to protect its own interests in its dealings with Lockwood and LAG.

The double-edged nature of Exhibit 30 also explains why the Trustee would have had reason to so gingerly handle it at trial.  As to why the Trustee has now changed course and is touting the significance of Exhibit 30, the Court can only surmise that once it expressed the initial view at the close of the trial that the Trustee had not met his burden, he concluded that, in spite of the negative aspect of the Exhibit, nothing was to be lost by throwing caution to the wind and making the argument that it proves the existence of a critical misrepresentation.

FNB argues that the statement in question from the office manager referred to in Exhibit 30 is hearsay – which it clearly is.  Unfortunately for FNB, however, at the pretrial conference it agreed that all of the exhibits identified by the parties would be admissible at trial without objection, subject only to trial objections such as relevancy, except that FNB reserved hearsay objections as to two of the proposed Exhibits – not including Exhibit 30.  *See Final Pretrial Order* at ¶4.  Thus, the Court will not exclude Exhibit 30 from its consideration solely on the basis of a hearsay objection.

FNB is on firmer ground in pointing to other problems with Exhibit 30 being used for the purpose now sought by the Trustee.  Among the points raised by FNB with which the Court agrees are the lack of any testimony to explain the nature and origin of Exhibit 30, the failure to identify either the "office manager" who supposedly made the statement or the person to whom the statement was made, and the failure to show the knowledge or authority of the office manager.  FNB

20

correctly points out that the Trustee never presented any DCF witness to try to address any of these matters, and never questioned Lockwood about them. Without such additional information to provide a context and explanation for Exhibit 30, the Court finds that the weight to be accorded the Exhibit for purposes of proving any misrepresentation by Lockwood/LAG is minimal – well below the burden of proof faced by the Trustee. *See, e.g., Mass. Mut. Life Ins. Co. v. Smith*, 194 F.2d 1006 (5th Cir. 1952) (reports containing hearsay were admitted without objection, however, the fact that they were based on hearsay went to their credibility and the jury could disregard them); *Johnson v. Dist. of Columbia*, *supra.*

### *Indirect Evidence of Actual Intent*

As an alternative means of attempting to show the existence of an actual intent to hinder, delay or defraud on the part of Lockwood/LAG, the Trustee points to the so-called "badges of fraud," which if present, may be considered as circumstantial evidence that allows a court to infer the existence of a fraudulent intent. *Moody v. Sec. Pac. Business Credit, Inc*., 127 B.R. 958, 990 (W.D. Pa. 1991). The use of badges of fraud in this regard is done in recognition of the fact that it is often difficult to adduce direct evidence of fraud. *In re Cohen*, 142 B.R. 720 (Bankr. E.D. Pa. 1992). The theory is that badges of fraud represent circumstances that so frequently accompany fraudulent transfers that their very presence may give rise to an inference of intent. *In re Hill*, 342 B.R. 183, 198 (Bankr. D.N.J. 2006).

Courts have used varying lists of these badges of fraud. For instance, the Trustee cites to *In re Lease-a-Fleet, Inc*. 155 B.R. 666, 674 (Bankr. E.D. Pa. 1993) wherein the court set forth a list of 11 badges of fraud. Another source can be found in *PUFTA*, which sets forth a list of 11 badges of fraud that is largely, but not completely, duplicative of those identified in *Lease-a-Fleet. See 12 Pa.C.S.A. §5104(b)*. In any event, the Trustee himself only asserts the presence of six (6) badges of fraud in the present case, so the Court need only examine them.

First, the Trustee claims there was a "close relationship" between the parties. The Court disagrees. The purported fraudulent transfer that occurred here was the pledge of the LAG CDs to FNB to secure Lockwood's debt. The relevant relationship here is therefore that between the transferor Lockwood/LAG and the transferee FNB. The undisputed evidence showed there was no significant relationship of any kind between those parties prior to the series of transactions in question.

The Trustee next contends that the Debtor retained possession, benefit or use of the property that was transferred. The Court disagrees with that contention as well since the evidence clearly showed that the CDs never left the possession of FNB, which was holding them as collateral.[13]

Third, the Trustee refers to the "financial condition of the party before and after." The Trustee provides no further explanation of what he means by this. In *Lease-A-Fleet* the Court

---

[13]   In its *May 14, 2010 Opinion* the Court pointed out that the record available at that point was inconclusive as to whether all of the various CDs had always remained in FNB's possession. *See id.* at fn. 10. The evidence at trial confirmed that all the CDs had, in fact, remained in the possession of FNB at all times. *Tr. Tran at 45-46.*

cited to this badge as referring to a contention that the debtor was insolvent both before and after the transfers at issue.  If that is indeed what the Trustee means to suggest here, the Court must again disagree because there was insufficient evidence presented as to insolvency.  If instead the Trustee is claiming that the Debtor's financial condition was worse after the transfer than before, the Court disagrees with that as well since the transfer was part of a "net wash" – the addition of the CDs being offset by the pledge to FNB.

The Trustee next refers to the "secrecy of the conveyance."  There is absolutely no evidence of any such secrecy.  The Trustee admits that FNB was told that DCF had approved of the transactions, and there was no evidence that FNB was instructed to hide the transactions or deny their existence to anyone.  As was previously indicated, Lockwood gave conflicting testimony as to whether DCF was told about the transactions.  The DCF personnel who would have been able to provide testimony on the point were not called as witnesses by the Trustee.  Thus, the Court is unable to even conclude that DCF was not informed about the transactions, let alone that there was an active coverup.  LAG reported the CDs on its monthly financial statements submitted to DCF, and the full extent of the transactions, including the pledges, were disclosed in the notes to LAG's Consolidated Financial Statement, Exhibit 18, which was available to DCF upon request.

The fifth badge cited by the Trustee is "a pattern of a series of transactions after incurring debt or financial difficulties."  Clearly there was a pattern or series of transactions here, though it is arguable whether the Trustee has shown that it occurred after incurring debt or financial difficulties.  The Court will nevertheless note this as a possible "badge."  At best, the Trustee has shown only the possibility that this badge of fraud has applicability to this set of facts.  However,

23

the Court does not believe this "possibility," without more, rises to the level of proof necessary to

sustain the Trustee's required burden in this case.

The Trustee's final, asserted badge of fraud is the "general chronology of events."

Once again, however, the Trustee fails to provide any further explanation, and the Court is frankly

uncertain as to how he contends the general chronology of events in this case supports an inference

of fraud.  As indicated above, the first transaction in this case occurred before the Recapitalization

Agreement was signed, which if anything, would negate any intent, actual or circumstantially, to

hinder, delay or defraud.  The Court therefore finds that this badge of fraud is absent from the case.

The end result is that there is only one possible badge of fraud present in this case

creating an inference in support of the Trustee's claim – and a rather insignificant one at that.  *See,

e.g. In re Cohen, supra*, 142 B.R.  at 729  (noting that the very significant badges were "adequacy

of consideration" and "effect of the transfer on the transferor's financial condition).  The Court finds

that the possible presence of this single, not very significant, badge of fraud is insufficient to prove

any actual intent. *See*, *Cohen*, *supra*; *Lease-A-Fleet*, 155 B.R. at 675 (existence of two badges was

of itself not worth very much).

### Conclusion as to Actual Intent

To sum up, the Court finds that the Trustee has not met his burden of proving an

actual intent to hinder, delay or defraud on the part of Lockwood/LAG by clear and convincing

24

evidence.[14] Before moving on, there are a couple of other matters related to the Trustee's case that the Court will briefly address.

First,  FNB makes the point  that the Trustee is operating from the premise that the type of transactions at issue here were *per se* wrongful.  The Court  agrees that the Trustee appears to be of the view that there was no other conceivable purpose for these transactions other than to misleadingly inflate the working capital of LAG, and therefore they were inherently fraudulent transfers.  That view is not supported by the record.

As the Trustee acknowledges, expert accounting witness Matt Minnaugh testified that there would be a tax-related reason for this type of transaction in that it would enable Lockwood to increase her basis in LAG, which could in turn affect her ability to deduct losses from LAG. Responding to that undisputed legitimate purpose, the Trustee asserts:

> However, [Lockwood] testified that taxes were not a consideration in this transaction with FNB.  Showing more working capital on the dealership's books was <u>the</u> sole consideration.

*Trustee's post-trial brief* at 6 (emphasis in original).  A review of the transcript from Lockwood's testimony at trial does not support the Trustee's assertion.  While Lockwood did state that showing more capital was the purpose for "going to the bank," she never said it was the sole consideration. Furthermore, she was never even asked anything about taxes.  *Tr. Tran. at 11.*  Thus, the Trustee's argument that the transactions were *per se* wrongful must be rejected.

---

[14]      The Court made a pretrial ruling that the Trustee's burden was by clear and convincing evidence. *See Final Pretrial Order.*  The Court recognizes that there is a split of opinion as to the proper burden of proof to be applied in an actual intent case, with some courts imposing only a preponderance of the evidence burden on the plaintiff.  *See In re Dolata*, 306 B.R. 97, 117 (Bankr. W.D. Pa. 2004) (citing cases for both views).   Even assuming that preponderance of the evidence was the proper standard to apply, the Court would still find that the Trustee had failed to meet his burden under that less stringent standard.

Finally, although it was not FNB's burden to disprove an actual intent to hinder, delay or defraud, it is worthy of note that in the Court's view some of the evidence presented actually supported an absence of such intent.  As indicated above, the series of transactions between Lockwood/LAG and FNB commenced before the inception of the Recapitalization and Loan Addendum Agreements so heavily relied upon by the Trustee.  That simply does not square with the Trustee's theory that the transactions were done in response to a new requirement to infuse capital into LAG, thereby undercutting any suggestion of an intent to defraud.  The Court also finds it highly significant that the Debtor's December 2003 Consolidated Financial Statements fully disclosed the pledged status of the CDs in the financial notes section.  DCF had the right at any time to "full and unfettered access" to all books and records maintained by the Debtor.  *See* Recapitalization Agreement at ¶5.1, Exhibit 18.  The inclusion of information about the CDs being pledged in a document that DCF could have had at any time, simply for the asking, is totally inconsistent with an actual  intent to hinder, delay or defraud creditors.

### *GOOD FAITH OF FNB*

As a matter of strict legal logic the Court's finding that the Trustee has failed to meet his burden of proving an actual intent to hinder, delay or defraud creditors results in an end to the Trustee's case.  However, even if the Trustee had met that burden, FNB still had an affirmative defense available to it that would allow recognition of its lien and protect it from liability if it could show that it acted in good faith with respect to the transactions.  Since the Court took FNB's motion to dismiss at trial under advisement in order that it could hear evidence from FNB as to the good

faith issue, it is only proper to make known its findings as to that evidence.  As discussed below, the

Court finds that FNB met its burden of showing that it acted in good faith, and it would therefore

still have found in favor of FNB on that basis even if the Trustee had proved Lockwood/LAG acted

with an actual intent to hinder, delay or defraud.

The concept of good faith on the part of a transferee in a fraudulent transfer action

is found as part of the affirmative defense set forth in *Section 548(c),* which provides in relevant

part:

> ... a transferee ...that takes for value and in good faith has a lien on or may
> retain any interest transferred ...

*See 11 U.S.C. §548(c)*. For a corresponding provision under *PUFTA, see 12 Pa. C.S.A. §5108(a),

(d)*.

As can be seen, this  affirmative defense has two elements, value and good faith.  The

District Court has previously ruled that FNB gave value in exchange for the security interest in the

CDs, so the only remaining substantive issue as to whether FNB has a viable affirmative defense to

the fraudulent transfer claim  is whether FNB took the transfer in "good faith."   That term is not

defined in the Bankruptcy Code.  Courts have concluded that the term defies an easy or precise

definition, such that good faith defenses must be evaluated on a case-by-case basis.  *In re Burry*, 309

B.R. 130, 136 (Bankr. E.D. Pa. 2004).

Whether under the *Bankruptcy Code* or *PUFTA*, good faith is determined according

to an objective or "reasonable person" standard based on what the transferee objectively knew or

27

should have known. *Ameriserv Fin. Bank v. Commercebank, N.A.*, 2009 WL 890583 *5 (W.D. Pa. 2009).  Among the circumstances that may preclude a finding of good faith are notice of the transferor's fraudulent purpose, an underlying fraud, the transferor's unfavorable financial condition or insolvency, the improper nature of a transaction, and the voidability of the transfer. *Id.* at *6.

When the applicable standard is applied, it is clear that FNB was acting in good faith in connection with the CD transactions at issue.  There are a number of factors that lead the court to that conclusion.  One significant factor is the nature of the pre-existing debtor/creditor relationship between Lockwood/LAG and DCF.

DCF was a "floor plan" lender to LAG, and it was undisputed that Slomski was told that DCF had approved of the transactions involving the CDs.  Slomski was asked about his understanding as to how floor plan lenders "police, verify or oversee their loan requirements."  He responded by testifying that, in his experience, floor plan lending is "very methodical and detailed," "hands on hood" and "very detailed in terms of following up on requirements as it relates to floor plan financing." *Tr. Tran* at 61.  Slomski testified that, having been told that DCF had agreed to the transaction he thought that DCF would apply whatever methodology they thought necessary to validate the investment by Lockwood. *Id.* At 61-62.

Wegerszyn agreed with Slomski's characterization, affirmatively answering a question as to whether  it was DCF's policy to vigorously police, verify and oversee the financial requirements it has with its dealers. *Id.* at 90.  Indeed, the evidence further showed that there was an intensely interactive relationship between LAG and DCF, with frequent reporting and ongoing scrutiny.  FNB therefore acted in an objectively reasonable manner by assuming DCF would properly look after its own interests, and it cannot be faulted for DCF's failures in that regard.

28

A second, significant factor demonstrating FNB's good faith at all relevant times was the investigation it undertook prior to its participation in the loan/CD transactions. Even though FNB's loan policies did not require him to do so because of the nature of the proposed loan, Slomski obtained a financial statement from Lockwood, ran a credit check on her, and obtained financial records concerning LAG. None of this information raised any red flags – in fact, to the contrary. It showed a borrower in a strong financial situation relative to the size of loan being proposed, with a net worth of over $1.5 million and a credit score in the excellent range. The financial information from LAG showed a company with a net worth of $333,000, before the infusion of any additional capital by way of the CDs that were to be purchased with the loan proceeds. There was nothing to indicate that the parties were in a threatened financial position, or that any sort of fraud was being perpetrated.

In an effort to show that FNB was not acting in good faith, the Trustee presented the testimony of banking expert Lawrence Gardner. Gardner testified that the transactions between Lockwood/LAG and FNB were unique in his experience. However, just because a transaction is unique does not *ipso facto* mean it was thereby improper or done in bad faith. Gardner also expressed the view that FNB should not have entered into the transactions because they did not pass the "smell test." FNB argues that such a "smell test" is a purely subjective approach that is really no test at all, and the Court is constrained to agree.[15]

---

[15]        As the trier of fact, the Court may resolve issues by weighing the credibility of expert witnesses. *Fid. Bond & Mortgage Co. v. Brand*, 371 B.R. 708 (E.D. Pa. 2007). As a general matter, the Court gave little weight to the testimony of Gardner and when compared to the opinions of the two experts presented by FNB. The Trustee submitted a rambling, unfocused, 18-page expert report by Gardner prior to the trial, Document No. 149, that was difficult to follow. Gardner's trial testimony was equally rambling and difficult to follow, presented primarily in narrative form, for over 20 minutes until objection by the Defendant which was summarily sustained. The Court found Gardner's testimony to be of little benefit with respect to the issues actually in dispute.

The Court has previously commented that, when looked at from the standpoint of Lockwood/LAG, the evidence does not support the Trustee's contention that there was no other possible purpose for these transactions other than to deceive DCF.  Gardner testified that, from FNB's point of view, there was no reason whatsoever to enter into these transactions.  The Court must likewise reject that contention.  FNB did earn a modest "spread" between what it was receiving in interest from the Lockwood loans and what it was paying in interest on the LAG CDs.  Although no further business beyond these transactions was ever generated with Lockwood/LAG, which was one of the motives for FNB's involvement, there is no evidence that anything was improper about that approach.

FNB presented the expert testimony of Matthew Minnaugh and Thomas Doolin to support the contention that it acted in good faith in connection with these transactions.  As previously indicated, Minnaugh, an accounting expert, testified that there were legitimate tax reasons for a transaction such as the one at issue here.  He also testified that the monthly dealer forms required by DCF  were not GAAP compliant.  In his view, under the facts presented, it was proper from an accounting standpoint to show the CDs as current assets on the LAG financial statements (Exhibit 18) because the restriction was disclosed in the notes.  Doolin, an expert in banking practices, testified that FNB's credit policy was of the normal type found in the banking industry.  He was of the opinion that Slomski properly followed FNB's policy in all respects in connection with the transactions with Lockwood/LAG.

The Court found both of these expert witnesses  to be knowledgeable and credible. The Court accepts their testimony over that of the competing expert witness, Gardner, and finds it

30

further bolsters the conclusion that FNB acted in good faith in the transactions at issue. The evidence thus supports the Court's finding that FNB clearly acted in good faith throughout this matter.

### *EQUITABLE SUBORDINATION*

A final issue raised in the case was the Trustee's contention that FNB's security interest in the pledged CDs should be equitably subordinated pursuant to *Section 510* of the *Bankruptcy Code*. The Court has previously criticized the Trustee's equitable subordination claim as being somewhat inartfully pled in the *Amended Complaint*, but nevertheless sufficient to receive consideration since the Court would have the power, in any event, to *sua sponte* invoke an equitable subordination remedy if warranted by the facts. *See In re Clamp-All Corp*., 233 B.R. 198, 210-11 (Bankr. D. Mass. 1999).

The standard for providing an equitable subordination remedy is one of "inequitable conduct," a flexible inquiry developed on a case-by-case basis. *In re Winstar Commc's., Inc*., 554 F.3d 382, 411 (3d Cir. 2009). If the creditor is a non-insider, the evidence must show "more egregious conduct such as fraud, spoliation or overreaching." *Id*. at 412. The Court has previously concluded that FNB acted in good faith in this matter, and consistent with that reasoning it sees no reason to make a finding of inequitable conduct on the part of FNB.

Beyond that, the very term "equitable subordination" makes clear that principles of equity are to be considered in any application of this remedy. Since DCF is the creditor of the Debtor that would stand to benefit from any imposition of an equitable subrogation remedy here as

31

against FNB, it is entirely appropriate for the Court to take into account DCF's own conduct in this whole matter and how it comported with the standards to which a party seeking the aid of equity is held.  *See, e.g., In re Papercraft Corp*., 211 B.R. 813, 827 (Bankr. W.D. Pa. 1997) ( remedy of equitable subordination of creditor's claim should be reconciled with principles of equity).

One principle of equity is that it will not aid a party which is not vigilant, or deliberately foregoes an opportunity to discover material facts.  *See*, e.g., *Banco Urquijo, S.A. v. Signet Bank*, 861 F. Supp. 1220, 1251 (M.D. Pa. 1994) (finding bank failed to meet applicable standard when it made advances in the face of insufficient information and failed to require monthly financial statements although entitled to do so).

DCF was not vigilant in this case in numerous respects.  It had an absolute right under its agreements with Lockwood/LAG to demand financial information at any time and could have found Lockwood/LAG to be in default if they failed to comply.  DCF was also indisputably aware by no later than December 2002 of the existence of the CDs and of its own lack of any documentation to confirm that the CDs were not encumbered.  Had DCF demanded LAG's consolidated financial statement, or had it otherwise been more protective of its interests, there is no reason why it would not have discovered the true nature of the CDs.

Given the lack of vigilance by DCF, it would be fundamentally unfair to equitably subordinate FNB's claim for the benefit of DCF.  The Court will not do so on this record.

32

## CONCLUSION

The Court finds that the Trustee has failed to meet his burden of proving that Lockwood/LAG were acting with an actual intent to hinder, delay or defraud creditors when they entered into the transactions at issue with FNB.  The Court considered direct evidence, as well as indirect evidence due to inferences arising from the alleged existence of certain "badges of fraud" and finds the Trustee's case lacking as to both.  Going beyond that which was strictly necessary, the Court also finds that, at all relevant times, FNB acted in good faith in this matter within the meaning of *11 U.SC. §548(c)* and the corresponding PUFTA provisions.  Thus, even if the Trustee met his burden regarding the substantive claims and was able to prove actual intent by Lockwood/LAG, FNB possessed a valid, affirmative defense to those claims.  Finally, the Court rejects any equitable subordination remedy because FNB did nothing to merit such a result and because DCF failed to vigilantly look after its own interests.  For the reasons stated above, the Court finds in favor of FNB and against the Trustee.  The case will be dismissed, with prejudice.

An appropriate order follows.

Dated: April 28, 2011

Thomas P. Agresti, Chief Judge
United States Bankruptcy Court

Case Administrator to serve:
    John M. Steiner, Esq.
    Richard W. Roeder, Esq.
    Patrick Delaney, Esq.
    John Melaragno, Esq.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| LOCKWOOD AUTO GROUP, INC. | : | Case No. 05-13558-TPA |
| *Debtor* | : | Chapter 7 |
| | | |
| RICHARD W. ROEDER, Trustee, | : | |
| *Plaintiff* | : | Adversary No. 06-1100-TPA |
| | : | |
| v. | : | Related to Document No. 69 |
| | : | |
| BARBARA A. LOCKWOOD, | : | |
| FIRST NATIONAL BANK of PA, | : | |
| *Defendants* | : | |

## **ORDER**

**AND NOW**, this **28th** day of **April, 2011**, based upon the findings or fact and conclusions of law issued pursuant to *Fed.R.Bankr.P. 7052* as set forth in the *Memorandum Opinion* filed this date, it is hereby ***ORDERED, ADJUDGED and DECREED*** that the Court finds in favor of FNB and against the Trustee.  The case is ***DISMISSED, with prejudice***.

Thomas P. Agresti, Chief Judge
United States Bankruptcy Court

Case Administrator to serve:
    John M. Steiner, Esq.
    Richard W. Roeder, Esq.
    Patrick Delaney, Esq.
    John Melaragno, Esq.